United States District Court

For the District of Columbia


UNITED STATES OF AMERICA,

v.                                                                                              No. 21-cr-00293 (RDM)

**Jeanine Henderson Arnett,**

        Defendant.

_____

**SENTENCING MEMORANDUM**

INTRODUCTION

    Jeanine Henderson Arnett is scheduled to be before the Court on November 23, 2021, for sentencing for a violation of a federal bank fraud statute, 18 USC S1344(a)(1). She understands she has plead to a class B felony and thus ineligible for probation. However, she asks the Court based upon the circumstance to Order home confinement pursuant §5C1.1.

    The loss amount is at issue only as far as apportionment with her co-defendant. The loss amount for guideline calculation purposes amount should <u>exclusively</u> or substantially apply to Mr. Arnett's conduct since as the losses were not "reasonably foreseeable" for the most part under §1B1.3 to Ms. Arnett inasmuch as her role was that of "covering up" the thefts and learning about the transactions after the fact. In the alternative, if the court attributes a

1

substantial loss amount to Ms. Arnett, that the Court impose a combination sentence of home confinement and a prison time under USSG §5C1.1 as sufficient punishment for a wife that couldn't stop the rouge activity of her otherwise loving husband. The facts of the case bear out that most if not all the transactions were performed by Mr. Arnett while Ms. Arnett was at work or traveling for work related activities. The government bears the burden of supporting its loss calculation with reliable and specific evidence, and it may not simply guess where such evidence is unavailable. *United States v. Ring*, 811 F. Supp. 2d 359 (DC District Court, 2011) [Criminal No. 08-274 (ESH)].

RELEVANT FACTS AND BACKGROUND

In 2014, Ms. Arnett husband (co-defendant Diallo Arnett) was diagnosed with a debilitating disease infecting his kidney and he began regular dialysis. Ms. Arnett became the breadwinner in their family. She was also caring for her mother of three young children. Ms. Arnett was also caring for her mom during this time period.

In candidly and quickly admitting her crime to the government prior to entry of a plea in this case, Ms. Arnett outlined how she mistakenly used her own credit card in place of the DST credit card by mistake and realized the internal controls for theft were easy to manipulate. The plan initially was for her and husband to just make a few small purchases, and to pay back the charges over time. Nearly all the purchases, particularly the paypal transactions which were converted to cash, were conducted solely by Mr. Arnett from a home computer. She learned

about the illegal transactions from her husband after-the-fact, and she says the illegal charges lead to a lot of arguments and turmoil in her household.  She has readily admitted she could have done more to stop her husband like turning him in to the police or the organization, but she loves him and she went along with the crime spree inasmuch as both of them intent was to refinance their home and repay DST in full.  Further, the government has been on notice at the latest from the objection to the loss amount lodged by Ms. Arnett through Counsel to the draft PSR that the illegal transactions were performed in real time with only the knowledge of Mr. Arnett, and yet the government has not submitted anything tangible to date to counter her claims of lack of foreseeability of the thefts.

## APPLICABLE LEGAL PRINCIPLES

Federal law expressly favors liberty over incarceration insofar as the purposes of promoting correction or rehabilitation are concerned. To that end, 18 U.S.C. § 3582 states: the court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Under § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." Such factors include the "nature and

circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed." 18 U.S.C. § 3553(a).  To determine the "need" for the sentence, the Court should consider if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." Id. at 2(A). Additionally, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Id. at 2(B-D). Further, the Court must be mindful of "the kinds of sentences available," the Guidelines and policy statements issued by the Sentencing Commission, including the Guidelines range, and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Id. at (3), (4) and (6).

Though an applicable Guidelines range is one factor to consider, it is not binding on the Court.  See *United States v. Booker*, 543 U.S. 220, 226-27 (2005); Cunningham v. California, 549 U.S. 270, 286 (2007), see also *United States v. Gardinelli*, 545 F.3d 1089, 1095 and 1096 (D.C. Cir. 2008) ("the Guidelines are truly advisory" and Gall gave "district judges even more discretion and authority." (emphasis in original)). While the Guidelines reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," §

3553(a) requires the Court to tailor an individualized sentence that actually does achieve its objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). In other words, the Guidelines are best understood as a helpful "starting point" or "initial benchmark," but courts should not "presum[e] that [a given] Guidelines range is reasonable." *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014); *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Rather, courts must treat the Guidelines "as one factor among several" and "make an individualized assessment," considering the remaining factors set forth in § 3553(a). Kimbrough v. United States, 552 U.S. 85, 90 (2007); Gall, 552 U.S. at 50-52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

### Nature of Offense and Characteristics of Ms. Arnett

During the relevant time of the theft, Ms. Arnett was working 12-15 hour days.  She was unhappy at work and describes the work environment as toxic.  She felt that she was constantly demeaned and put under enormous pressure.  The work environment, in her opinion, was not family friendly.  Her responsivities to her children suffered to a nearly catastrophic result with one of the children.  In addition, she lost her father in 2018, and the organization demanded

5

she be back at work in a "matter of days" because a convention was coming.  Things at home was not much better.  The couple was fighting about the illegal charges placed on the DST cards.

Mr. Arnett had access and copies of the DST credit cards which Ms. Arnett kept at home.  Ms. Arnett didn't learn of the transactions until the bills came out.  The credit cards bills generally had 3 months to be paid, and Mr. Arnett would assure Ms. Arnett that he would figure out how to pay for the fraudulent charges before the payments were due.   When Ms. Arnett learned of the illegal balanced accumulated on the DST cards, their plan was to refinance her home and pay DST in full.  They had bought the home the year earlier and moved in with the house containing substantial equity.  However, they learned that with an FHA mortgage that refinancing in the first year was prohibited by federal law.  She was afraid to tell her employer about the illegal charges.  She was trapped.

## CONCLUSION

A sentence to be served on house arrest using the principles outlined in U.S.S.G. §5C1.1(c)(3) and §5F1.2 would adequately reflect Ms. Arnett's participation and acquiesce of this crime.  According to Ms. Arnett, on the afternoon of the plea hearing in this case, the brass at DST contacted Ms. Arnett's then current employer at the Loudoun County government,

informing her boss (another DST member) about the criminal case.  Ms. Arnett was fired from her job that afternoon.  According to Ms. Arnett, on the afternoon of the plea hearing in this case, the brass at DST contacted Ms. Arnett's then current employer at the Loudoun County government, informing her boss (another DST member) about the criminal case.  Ms. Arnett was fired from her job that afternoon.  With the delay of the start of the case due to the Pandemic, Ms. Arnett has been under the looming stress of this matter since 2018.  The punitive nature of the sentence has already been levied against her.

Respectfully submitted,

/s/Kevin J. McCants (493979)
601 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004
202.459.4676

CERTIFICATE OF SERVICE

I KJ McCANTS attest that a true and complete copy of the Defense Sentencing Memorandum and attachments was served on all the parties via ECF on this 17th day of November 2021.

/s/Kevin J. McCants

7

8

8